**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: scott@bursor.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEREMY NICHOLS and LEON WILDE, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> AARP, INC., AARP SERVICES INC., AARP INSURANCE PLAN, UNITEDHEALTH GROUP, INC., and UNITEDHEALTHCARE INSURANCE COMPANY, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiffs Jeremy Nichols and Leon Wilde ("Plaintiffs") make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## SUMMARY OF THE ACTION

1.      This is a consumer class action seeking to recoup millions of dollars on behalf of a class consisting of senior citizens and disabled individuals residing in the State of California whom Defendants charged for illegal insurance commissions.

2.      Defendant AARP, Inc., along with its subsidiaries (collectively, "AARP"), formerly known as the American Association of Retired Persons, is a tax-exempt, "non-profit" membership organization for seniors aged 50 years and older.  AARP has long been regarded as a protector and advocate of the nation's senior community, and today AARP is reported to have over 40 million members – about half of whom are over the age of 65.

3.      Despite its "non-profit" status, however, AARP reaps substantial income through business partnerships with large insurance companies like defendants UnitedHealth Group, Inc. and UnitedHealthcare Insurance Company (collectively, "UnitedHealth") in the form of commissions.

4.      As alleged herein, defendants AARP and UnitedHealth, together and through their respective subsidiaries (collectively, "Defendants"), have orchestrated an elaborate scheme where AARP, as the *de facto* agent of UnitedHealth, helps market, solicit and sell or renew coverage for UnitedHealth Medicare Supplement insurance (also known as "Medigap") and generally administers the program for UnitedHealth, in exchange for a 4.95% commission on Member Contributions.

5.      Defendants, while acknowledging the existence of these payments, characterize them as a "royalty" that UnitedHealth pays AARP in exchange for its use of AARP's intellectual property.  In reality, however, UnitedHealth makes the payments to AARP in exchange for AARP's marketing, solicitation and administration activities.  As such, the payments constitute insurance producer compensation or commissions.

6.      Defendants' motive for characterizing these commission payments as a "royalty" is two-fold:  (1) it allows AARP to avoid oversight by insurance regulators, and (2) it allows AARP to avoid paying taxes on the income it generates through insurance sales.  Calling the commission a "royalty" is merely a fiction created by Defendants to further their illegal scheme.

7.      Indeed, other associations similar to AARP do the right thing and acquire a license to act as an agent, subjecting themselves to regulatory oversight, and paying taxes.[1]

8.      As detailed herein, Defendants' acts are unlawful because they violate California's insurance law, and concomitantly violate the California Unfair Competition Law ("UCL").  For example, despite the fact that AARP is not licensed as an insurance agent in the State of California, it regularly acts as the *de facto* agent for UnitedHealth by helping market, solicit and sell the UnitedHealth Medicare Supplement product in exchange for a 4.95% commission.  These activities violate multiple provisions of California insurance law.  *See, e.g.*, Cal. Ins. Code § 1631 ("Unless exempt by the provisions of this article, a person shall not solicit, negotiate, or effect contracts of insurance, or act in any of the capacities defined in Article 1 (commencing with Section 1621) unless the person holds a valid license from the commissioner authorizing the person to act in that capacity."); Cal. Ins. Code § 10112.5(a)(1) ("Notwithstanding any other provision of law, every policy or certificate of health insurance marketed, issued, or delivered to a resident of this state, regardless of the situs of the contract or master group policyholder, shall be subject to all provisions of this code.").

9.      Because AARP is not licensed as an insurance agent, broker or consultant, it may not collect a commission for its marketing, soliciting or selling/renewing of UnitedHealth Medicare Supplement product on behalf of UnitedHealth.

10.      The end result of Defendants' violations of California insurance law is that consumers are charged an artificially inflated amount for insurance coverage that is prohibited by law.  Put differently, Plaintiffs were injured by the actual loss of the 4.95% commission payments

---

[1] The automobile club AAA, for example, is licensed to sell insurance.

and paid more for the UnitedHealth Medicare Supplement product because of Defendants' challenged conduct.

11.     If Defendants had acted within the bounds of the law, Plaintiffs would not have been charged an illegal 4.95% commission.

12.     But for Defendants' deceptive and unlawful acts, Plaintiffs and the other members of the Class would not have been charged for, and would not have paid, the 4.95% illegal insurance commission that Defendants included in their monthly Member Contributions.

13.     Plaintiffs bring this action on behalf of the Class for equitable relief and to recover damages and restitution for violations of California's UCL and unjust enrichment.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below (the "Class"), is a citizen of a different state than defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District

16.     This Court has personal jurisdiction over Defendants because the named Plaintiffs reside in this District and purchased their UnitedHealth Medicare Supplement coverage in this District, and because Defendants (a) are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution, and sale of UnitedHealth Medicare Supplement coverage in this District; (b) conduct substantial business in this District; and (c) are subject to personal jurisdiction in this District.

## PARTIES

17.     Plaintiff Jeremy Nichols is a resident of Sonoma County, California.  Mr. Nichols purchased UnitedHealth Medicare Supplement coverage in California in or around 2013 and has

paid his premium for that coverage every month since. But for Defendants charging him illegal commissions, Mr. Nichols would have paid 4.95% less for his UnitedHealth Medicare Supplement coverage.

18.     Plaintiff Leon Wilde is a resident of Redwood City, California. Mr. Wilde purchased UnitedHealth Medicare Supplement coverage in California in or around 2013 and has paid his premium for that coverage every month since. But for Defendants charging him illegal commissions, Mr. Wilde would have paid 4.95% less for his UnitedHealth Medicare Supplement coverage.

19.     Defendant AARP, Inc. is a non-profit corporation organized under the laws of the District of Columbia and maintains its primary place of business is at 601 E Street, NW, Washington, D.C. 20049. AARP, Inc. conducts substantial business in the State of California.

20.     Defendant AARP Services, Inc. ("ASI") is a wholly-owned subsidiary of AARP, organized under the laws of Delaware. ASI maintains its primary place of business at 601 E Street, NW, Washington, D.C. 20049. ASI conducts substantial business in the state of California. ASI is AARP's taxable "for-profit" division that negotiates, oversees, and manages lucrative contracts with AARP's insurance business partners. AARP created ASI in 1999 pursuant to a settlement agreement with the U.S. Internal Revenue Service ("IRS") resulting from an investigation by the IRS into the large amount of income that AARP, Inc., a "non-profit" tax-exempt organization, earned through its "endorsement" deals. This settlement was one of several that AARP, Inc. entered into with the IRS and other entities, such as the U.S. Postal Service and the tax authorities of the District of Columbia, all relating to AARP, Inc.'s failure to fully pay unrelated business income tax on its commercial activities, as well as improperly mailing health insurance solicitations at non-profit rates.

21.     Defendant AARP Insurance Plan ("AARP Trust") is a grantor trust organized by AARP, Inc. under the laws of the District of Columbia and maintains its primary place of business at 601 E Street, NW, Washington, D.C. 20049. AARP Trust is the vehicle through which AARP, Inc. collects, invests and remits premium payments for UnitedHealth Medicare Supplement

coverage and collects its unlawful 4.95% commission.  AARP Trust conducts substantial business in the state of California.

22.     At all material times, defendant AARP, Inc. dominated and controlled defendants ASI and AARP Trust.

23.     Defendants AARP, Inc., ASI and AARP Trust are collectively referred to herein as "AARP."

24.     Defendant UnitedHealth Group, Inc. ("UnitedHealth Group") is an insurance corporation organized under the laws of the State of Minnesota and maintains its corporate headquarters in Minnetonka, Minnesota.  UnitedHealth Group conducts substantial business in the State of California.  UnitedHealth Group is the largest single health insurer in the United States.

25.     Defendant UnitedHealthcare Insurance Company is an operating division and wholly owned subsidiary of UnitedHealth Group and maintains its corporate headquarters in Hartford, Connecticut.  UnitedHealthcare Insurance Company conducts substantial business in the State of California.  UnitedHealth Medicare Supplement plans are insured by UnitedHealthcare Insurance Company.

26.     Defendants UnitedHealth Group and UnitedHealthcare Insurance Company are collectively referred to herein as "UnitedHealth."

## FACTUAL ALLEGATIONS

27.     By any measure, AARP is a large, complex and sophisticated enterprise with over $4.2 billion in total assets and operating revenues of over $1.65 billion in 2018.

28.     Despite its "non-profit" status, however, AARP earns substantial revenue through business partnerships with large insurance companies, like defendant UnitedHealth, to sell its own "AARP-branded" insurance policies.

29.     Among other products, AARP endorses three types of Medicare-related insurance products from UnitedHealth: Part D prescription drug insurance, Medicare Advantage, and Medicare Supplement.

30.     Medicare Supplement plans offer extra coverage to Medicare beneficiaries (*i.e.*, seniors and the disabled) enrolled in traditional Medicare, such as first-dollar coverage and reduced co-payment and deductibles.  In addition, all Medicare Supplement plans provide coverage for hospital stays and reduce seniors' out-of-pocket costs for physician office visits.  Medicare Supplement enrollees must pay a monthly premium that exceeds their Medicare premium in order to receive these additional benefits.  In 2018, over 14 million Americans were enrolled in a Medicare Supplement plans to supplement their traditional Medicare coverage.

31.     UnitedHealth Medicare Supplement is the dominant player in the Medicare Supplement market.  Nationwide, UnitedHealth Medicare Supplement has over three times as many Medicare Supplement enrollees as its closest competitor, Mutual of Omaha.  As of 2018, 34% of all Medicare beneficiaries enrolled in a Medicare Supplement insurance plan were enrolled in UnitedHealth Medicare Supplement.

32.     In 2018, AARP generated over $900 million in revenues from its so called "royalties," which is more than three times higher than income generated from membership dues, and makes up 57% of AARP's 2018 total operating revenue.

33.     Because of its tax-exempt status, the substantial income that AARP generates has drawn the attention of the IRS and the tax authorities of the District of Columbia on more than one occasion.  In 1999, AARP entered into a settlement agreement with the IRS due to AARP's failure to fully pay unrelated business income tax on its commercial activities.  As part of that settlement, AARP created ASI to act as AARP's "for-profit" arm.  Even with the creation of ASI as a taxable entity, however, AARP still retains the vast majority of its income, tax-free.

34.     AARP's current Medicare Supplement business relationship with UnitedHealth began on February 26, 1997, when AARP and UnitedHealth entered into a joint venture agreement entitled the "AARP Health Insurance Agreement" (the "Agreement").

35.     Under the terms of the Agreement, AARP would: (1) market, solicit, sell and renew UnitedHealth Medicare Supplement coverage; (2) collect and remit premium payments on behalf

of UnitedHealth; (3) generally administer the UnitedHealth Medicare Supplement program; and (4) otherwise act as UnitedHealth's agent.

36.     In exchange for its services, the Agreement provided AARP with a 4% "allowance" for every dollar received from the sale or renewal of UnitedHealth Medicare Supplement coverage, as well as an additional 2.5% for each dollar over $1 billion:

> ARTICLE 6
> ALLOWANCES AND COMPENSATION
> 10 6.1 AARP ALLOWANCE.  AARP shall be entitled to receive an allowance for AARP's sponsorship of the SHIP and the license to use the AARP Marks in connection therewith. ***For each Policy Year, this allowance shall be equal to the sum of (i) four percent of the first $1 billion in Member Contributions plus (ii) two and one-half percent of the Member Contributions in excess of $1 billion.***  This allowance shall be payable in accordance with Section 6.7 hereof. (Emphasis added).

37.     The Agreement was amended on December 28, 1999 in connection with AARP's settlement with the IRS.  The 1999 amendment, inter alia, renamed AARP's "allowance" a "royalty" and directed 8% of AARP's "royalty" to its taxable subsidiary, ASI:

> It is intent [sic] of the parties hereto that the payment made by United to AARP pursuant to the United Agreement and referred to  as an allowance is a royalty and pursuant to this Assignment and the agreement referred to in this paragraph, the royalty is to be bifurcated into a payment to AARP Services for Quality Control and monitoring and to AARP for use of the AARP Marks.  AARP shall grant United an exclusive license to use the AARP Marks by separate agreement. Such separate agreement shall obligate United to compensate AARP for the use of its intangible property by the payment of a royalty.

38.     The Agreement was amended again on December 23, 2002 to increase the amount of AARP's "royalty":

> 1.     Subsection 6.1 of the Agreement is amended by deleting this subsection in its entirety and replacing it with (sic) following:
>      6.1 AARP Royalty.  AARP shall be entitled to receive a royalty for AARP's sponsorship of the SHIP and the license to use the AARP Marks in connection therewith.  This royalty shall be 3.25% of Member Contribution for Policy Year 2002 and 3.75% of Member Contributions for Policy Year 2003.  For Policy Years 2004

---

CLASS ACTION COMPLAINT                                                                           7

through 2007, the royalty shall be 4% of Member Contribution, with a review of the increased royalty amount on rates and competitive position prior to implementation.

39.     In 2007, the parties extended the Agreement through to December 31, 2014, as explained in UnitedHealth's quarterly report, filed with the U.S. Securities and Exchange Commission ("SEC") on May 9, 2007:

On April 13, 2007, we entered into an agreement to extend and expand our relationship with AARP through December 31, 2014. The agreement was expanded to give us a right to use the AARP brand on our Medicare Advantage offerings and to **extend our arrangement to** use the AARP brand on our Medicare Supplement products and **services** and Medicare Part D offerings. (Emphasis added.)

40.     Six months later, the parties further extended the Agreement for an additional three years through to December 31, 2017, as explained in UnitedHealth's 2007 yearly report filed with the SEC:

On October 3, 2007, we entered into four agreements with AARP that amended our existing AARP arrangements and incorporated many of the terms of the April 13, 2007 AARP agreement.  These agreements extended our arrangements with AARP on the Supplemental Health Insurance Program [AARP Insurance] to December 31, 2017, extended our arrangement with AARP on the Medicare Part D business to December 31, 2014, and gave us an exclusive right to use the AARP brand on our Medicare Advantage offerings until December 31, 2014, subject to certain limited exclusions.

41.     On October 15, 2013, AARP and UnitedHealth announced that they were extending the Agreement to run through December 2020.  Stephen J. Hemsley, president and CEO of UnitedHealth Group, noted that "We are honored to build upon our unique and innovative relationship with AARP, which has helped both UnitedHealthcare and AARP provide better support and value to the consumers we serve."[2]

---

[2] https://www.optum.com/about/news/unitedhealth-grouptoextendbroadenitsrelationshipwithaarptofocusm.html.

42.     Under the terms of the current Agreement, in exchange for AARP's administering of the insurance program and the marketing, soliciting, and selling or renewing UnitedHealth Medicare Supplement coverage on behalf of UnitedHealth, as well as its collecting and remitting insurance premiums on behalf of UnitedHealth, AARP earns a 4.95% illegal commission.

43.     The Agreement's terms require AARP to aid in the solicitation of the sale of insurance and to generally act as the insurance agent of UnitedHealth.

44.     The Agreement as of 2011 was reviewed by Congressional staff members from the House Committee on Ways and Means as part of its investigation into AARP's tax status.  AARP's obligations under the Agreement were described in a December 21, 2011 letter from the Ways and Means Committee to the IRS as follows:

> Congressional staff recently had the opportunity to review three redacted contracts between AARP and AARP Services, Inc. (ASI) and United.  The contracts covered United's marketing and sale of AARP branded Medigap, Medicare Advantage, and Medicare Part D policies.  The contracts raised a number of issues related to AARP's involvement in for-profit business activities and governance issues among the various AARP entities.
>
> The three contracts, signed in January 2008 and which are still in effect, detail AARP and ASI's extensive influence over United's operations, most notably in the Medigap business, and several instances in which United is required to take specific actions, beyond making "royalty" payments, to the benefit of AARP.  The contracts include the following provisions that raise numerous questions about AARP's involvement in for profit activities:
>
> a.     ASI is placed in the role of quality control contractor and overseer of United's operations, as it relates to Medigap, Medicare Advantage, and Medicare Part D.
>
> b.     The contracts create a "Senior Leaders" team that oversees all aspects of performance under the contracts.  Both United and ASI each have two officials appointed to the "Senior Leaders" team, which coordinates all aspects of contract performance and must consent to any action under the contract. At least one United and one ASI "Senior Leader" must consent to any decision. Further demonstrating AARP's active role in directing the decisions of the insurer, ASI must approve United's appointments to the "Senior Leaders" team.

c.      ASI has authority over United's "Operating Plan" and may "approve, modify on a line by line basis, or provide specific direction to United," regarding the plan.

d.      ASI is given prior review and approval authority over all proposed electronic, print, verbal, or scripted communication regarding AARP-endorsed Medigap plans directed at both AARP members and non-AARP members.

e.      United is responsible for marketing campaign audits and analysis, but all strategy developments and modifications must be made in collaboration with AARP.

f.      ASI oversees and monitors the agent certification process and must approve the agent compensation program.

g.      ASI has consultation, review, and consent rights related to any proposed plan design changes including, but not limited to, annual budgets, premium levels and rates, and sales and distribution plans.

h.      United is barred from directly or indirectly marketing or offering products or programs that compete with AARP-endorsed Medigap plans.

i.      ASI has review and modification authority over United's Medigap-related contracts with third-party vendors exceeding $250,000.

j.      United must submit to ASI a detailed projection of policy financials, including recommended member premiums for the coming year. ASI may object to the premium levels, and if no agreement is reached the issue goes to dispute resolution.

k.      United may contract with ASI separately to perform consulting and marketing services in connection with the sale of AARP-endorsed Medigap plans. Such agreements are separate from the primary contract but indicate the possibility of the AARP subsidiary's further involvement in business operations.

l.      United's annual incentive program for senior executives is, in part, dependent on meeting the "transformational" goals established by AARP and ASI.

m.      Any expenditure of Medigap funds not addressed in the contract requires the prior written approval of ASI.

45.     UnitedHealth compensates AARP to act as its agent in connection with the marketing, solicitation, sale and administration of the UnitedHealth Medicare Supplement program.

46.     AARP actively helps solicit and market the UnitedHealth Medicare Supplement product for UnitedHealth through television commercials, its website, and advertisements in various periodicals and publications.

47.     AARP is engaged in actively soliciting consumers to purchase UnitedHealth Medicare Supplement coverage and is thus acting as an unlicensed insurance agent of UnitedHealth.  Examples of this active solicitation include, but are not limited to, the following:

- www.aarphealthcare.com advertises details of UnitedHealth Medicare Supplement insurance and explicitly states, "**This is a solicitation of insurance.**" (Emphasis in original.)

- www.aarphealthcare.com explains some of the terms of the policies that are offered: "A Medicare Supplement Insurance Plan, such as an AARP Medicare Supplement Insurance Plan insured by UnitedHealthcare Insurance Company, may help pay some of the health care costs that Medicare Parts A and B don't cover like copayments, coinsurance and deductibles for Medicare approved services. Your coverage travels with you throughout the U.S. and there are virtually no claim forms to file.  Medicare Supplement Insurance plans also let you keep your own doctors and specialists who accept Medicare patients — *and you never need to get a referral!*" (Emphasis in original.)

- www.aarpmedicareplans.com provides even greater detail about UnitedHealth Medicare Supplement plans that are offered and allows users to enter their California zip code to "View Plans & Pricing."

- www.aarpmedicareplans.com also explicitly states, "**This is a solicitation of insurance.**" (Emphasis in original.)

- AARP television and Internet video advertisements promoting UnitedHealth Medicare Supplement plans also display the same language, "**This is a solicitation of insurance.**" (Emphasis in original.)

- Print advertisements for UnitedHealth Medicare Supplement plans in the **AARP Bulletin** magazine note: "**This is a solicitation of insurance.**" (Emphasis in original.)

- These same print advertisements provide a toll-free phone number, 1-866-314-8679, to call "AARP Health" in order to receive a free information kit to "Tell me more

about AARP Medicare Supplement Insurance Plans."  The reader is also encouraged to "Call to receive complete information including benefits, costs, eligibility requirements, exclusions and limitations."

- AARP Member Advantages (formerly AARP Health) is "a collection of products, services and insurance programs made available by AARP."  The page also notes that "AARP knows you want quality, affordable health care. And through relationships with leading companies, AARP makes available a range of health products, services and discounts."

48.     For every UnitedHealth Medicare Supplement customer, AARP collects insureds' premium payments, including the 4.95% commission, through the AARP Trust on behalf of UnitedHealth.

49.     After deducting the 4.95% commission from the consumers' payment and remitting this amount to AARP, Inc. and ASI, AARP then invests the insurance premiums that it collects for UnitedHealth in a wide range of securities.  UnitedHealth gives AARP the right to retain any gains on those investments, in addition to its 4.95% commission.  In 2009, 2010, 2011 and 2012, AARP earned $89,985,195, $56,668,525, $14,484,000 and $59,191,000, respectively, on the investment of premiums that it held in the AARP Trust prior to remittance of the premiums due to UnitedHealth.

50.     As premium payments become due, the AARP Trust remits the premiums to UnitedHealth.

51.     The 4.95% commission amount paid to AARP from the AARP Trust is bifurcated, with 8% going to ASI and 92% going to AARP, Inc.  The left side of a chart from the House Ways and Means Committee members' report, *Behind the Veil: The AARP America Doesn't Know*, demonstrates how AARP receives its commissions from the AARP Trust:



**CHART 5:** Flow of AARP Medicare-Related Royalty Payments

52.     AARP's 4.95% commission is not deducted from the actual costs to insure consumers.  Instead, according to the Agreement, AARP's commission is charged to consumers <u>on top</u> of the costs of insurance coverage:  "SHIP GROSS PREMIUMS for a Policy Year means the amount of Member Contributions minus the AARP allowance determined under Section 6.1 hereof for such policy year."  The Agreement distinguishes between the amount actually billed to and paid by consumers (i.e., "Member Contributions" or "Gross Premiums") and the costs of insurance itself ("Net Premiums").

53.     Consistent with this provision in the Agreement, Barry Rand, the CEO of AARP, testified before the House Ways and Means Committee on April 1, 2011, that "royalties have nothing to do with the premiums of beneficiaries.  Nothing to do with the premiums."  Mr. Rand

also testified that "[a]ll of the money that we have that comes out of the trust in interest goes to our mission.  None of the money is taken out of any of the premiums."[3]

54.     In addition, AARP's then President, W. Lee Hammond, testified the royalty payment was in addition to the costs of insurance coverage:  "We do take royalty payments from that money that comes in, and then, as requested by the insurance companies to cover their products, we return the balance of that money to them."[4]

55.     Mr. William Josephson, Of Counsel at Fried, Frank, Harris, Shriver and Jacobsen, LLP, and former Assistant Attorney General-in-Charge of the New York State Law Department's Charities Bureau, testified at the hearing that the evidence may suggest "the amounts characterized by AARP as royalty really are closer to insurance commissions, which I believe would be subject to unrelated business income tax.  This is a factual inquiry that is not necessarily resolved by questions of law."[5]

56.     Thus, while Defendants disclose the existence of a payment in general to AARP which they term a "royalty" paid for the use of AARP's intellectual property, Defendants hide the fact that the cost of UnitedHealth Medicare Supplement insurance includes a percentage-based commission to AARP that is funded by consumers, in addition to the costs of insurance coverage from UnitedHealth.

57.     Defendants affirmatively state in their UnitedHealth Medicare Supplement disclaimer language the following:

> Premiums are collected from you on behalf of the trustees of the [AARP] Trust.  These premiums are used to pay expenses incurred by the Trust in connection with the insurance programs and to pay the insurance company for your insurance coverage.  Income earned from the investment of premiums while on deposit with the Trust is paid to AARP and used for the general purposes of AARP and its members.

---

[3] https://waysandmeans.house.gov/hearing-on-aarps-organizational-structure-management-and-finances/.
[4] *Id.*
[5] *Id.*

58.     This statement is highly misleading and deceptive in that Defendants do not disclose that in addition to paying for the actual insurance coverage, and the administrative expenses incurred by the AARP Trust, 4.95% of the insured's payment is diverted to AARP as an illegal commission.

59.     Defendants' misrepresentations and omissions regarding UnitedHealth Medicare Supplement constitute an unfair, deceptive, and misleading practice in violation of California law.

60.     Defendants' acts violate the "unlawful" prong of California's UCL because they violate the Insurance Code.

61.     At all material times, UnitedHealth authorized AARP to act as its agent in the marketing, solicitation and sale of UnitedHealth Medicare Supplement plans.

62.     At all material times, AARP acted as the authorized agent of UnitedHealth in the transaction of health insurance, pursuant to Cal. Ins. Code §§ 35, 1622(a)(2) and 1626(a)(2), and therein engaged in the following acts:

(a) solicited the sale and renewal of insurance on behalf of UnitedHealth;

(b) solicited an application for insurance on behalf of UnitedHealth;

(c) received, collected, and/or transmitted an insurance premium to UnitedHealth; and

(d) generally aided in the transaction of the business of insurance.

63.     While AARP acts as an insurance agent, it is not licensed to act as such in the State of California - a clear violation of California insurance law.  See Cal. Ins. Code § 1631.

64.     And UnitedHealth has also violated California insurance law by authorizing AARP to act as its agent while knowing that AARP is not duly licensed.  See id.

65.     Because AARP is not licensed as an insurance agent, it is not permitted to collect a commission for its marketing, solicitation or sale/renewal of UnitedHealth Medicare Supplement coverage, and UnitedHealth may not pay such an illegal commission.

66.     The end result of Defendants' violations of California insurance law is that consumers are charged for illegal commissions that they should not have to pay.

67.     Defendants' illegal scheme takes advantage of unsuspecting senior citizens who all put their trust in the AARP name, in violation of California insurance law.

68.     As a result of Defendants' unlawful acts and conduct, consumers are harmed financially in that they are paying 4.95% above the actual cost of insurance coverage so that UnitedHealth and AARP can secretly divert this 4.95% illegal commission to the unlicensed AARP.

69.     But for Defendants' unlawful acts, Plaintiffs and the other members of the Class would not have charged for the illegal commission as part of their purchase and/or renewal of their UnitedHealth Medicare Supplement coverage.

70.     Put simply, Plaintiffs and the Class were injured by the actual loss of the 4.95% commission payments and paid more for UnitedHealth Medicare Supplement coverage because of Defendants' challenged conduct.

## INADEQUATE REMEDY AT LAW

71.     "A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law." Restatement (Third) of Restitution, § 4(2).  Here, Plaintiffs have no adequate remedy at law.  Any legal remedies available to Plaintiffs are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief.  *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also U.S. v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992 ("the 'mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief"); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity.  To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view . . . .  It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future").

a.  Damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages.  Hence, the

1            Court may award restitution even if it determines that Plaintiffs fail to sufficiently

2            adduce evidence to support an award of damages.

3       b.   Damages and restitution are not necessarily the same amount.  Unlike damages,

4            restitution is not limited to the amount of money defendant wrongfully acquired plus

5            the legal rate of interest.  Equitable relief, including restitution, entitles the plaintiff

6            to recover all profits from the wrongdoing, even where the original funds taken have

7            grown far greater than the legal rate of interest would recognize.  Plaintiffs seek

8            such relief here.

9       c.   Legal claims for damages are not equally certain as restitution because claims under

10           the UCL and unjust enrichment entail few elements.

11       d.   Plaintiffs also lack an adequate remedy at law to prevent future harm.

12                   **<ins>CLASS ALLEGATIONS</ins>**

13    72.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the

14 Federal Rules of Civil Procedure, individually, and on behalf of the following Class:

15            All persons residing in the State of California who are or were

16            enrolled in a Medicare Supplement Insurance Plan insured by
               UnitedHealthcare Insurance Co.

17

18    73.    Subject to additional information obtained through further investigation and

19 discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or

20 amended complaint.

21    74.    Specifically excluded from the Class are Defendants, Defendants' officers,

22 directors, agents, trustees, parents, children, corporations, trusts, representatives, employees,

23 principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs,

24 successors, assigns, or other persons or entities related to or affiliated with Defendants and/or

25 Defendants' officers and/or directors, the judge assigned to this action, and any member of the

26 judge's immediate family.

27

28

75.    **Numerosity.**  The members of the Class are geographically dispersed throughout the State of California and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiffs reasonably estimate that there are tens of thousands of members in the Class.  Although the precise number of Class members is unknown to Plaintiffs, the true number of Class members is known by Defendants.  More specifically, Defendants maintain databases that contain the following information: (i) the name of each Class member who has purchased and/or renewed UnitedHealth Medicare Supplement coverage; (ii) the address of each Class member; and (iii) each Class member's payment information related to UnitedHealth Medicare Supplement.  Thus, Class members may be identified and notified of the pendency of this action by first class mail, electronic mail, and/or published notice, as is customarily done in consumer class actions.

76.    **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

(a)    whether AARP sold, solicited or negotiated UnitedHealth Medicare Supplement insurance coverage in violation of Cal. Ins. Code § 1631;

(b)    whether UnitedHealth paid, and AARP accepted, a commission, service fee, brokerage or other valuable consideration for selling, soliciting or negotiating insurance in this state in violation of Cal. Ins. Code § 1631;

(c)    whether AARP acted as an authorized agent of an insurer without a license in violation of Cal. Ins. Code § 1631;

(d)    whether UnitedHealth appointed AARP to act as its authorized agent while AARP did not hold a license to do so in violation of Cal. Ins. Code § 1631;

(e)    whether Defendants are liable to Plaintiffs and the Class for unjust enrichment;

(f)    whether Plaintiffs and the Class have sustained monetary loss and the proper measure of that loss;

(g)     whether Plaintiffs and the Class are entitled to declaratory and injunctive relief; and

(h)     whether Plaintiffs and the Class are entitled to restitution and disgorgement from Defendants.

77.     **Typicality.**  Plaintiffs' claims are typical of the claims of the other members of the Class in that, just like every other Class member, Defendants charged both Plaintiffs for illegal commissions.

78.     **Adequacy of Representation.**  Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Class.  Furthermore, Plaintiffs have no interests that are antagonistic to those of the Class.

79.     **Superiority.**   A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense of individual litigation of their claims against Defendants.  It would thus be virtually impossible for Class members, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

80.     In the alternative, the Class may also be certified because:

(a)     the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendants;

(b)     the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)     Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION
### COUNT I
**Unfair Competition Law, Bus. & Prof. Code § 17200 *et seq.* ("UCL")**

81.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated herein.

82.     Defendant is subject to the Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200 *et seq.*  The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

83.     Defendants violated § 17200's prohibition against engaging in unlawful or unfair business practices by, *inter alia,* charging consumers for illegal insurance commissions in violation of Cal. Ins. Code. §§ 332, 790.02, 790.03(a) and (b), 10192.55 and 1631.

84.     Defendants' conduct, as set forth herein, also constitutes unlawful business acts or practices because they violated the common law as set forth herein.

85.     Defendants' conduct also constitutes "unfair" business acts and practices within the meaning of the UCL in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

86.     Business & Professions Code § 17200 also prohibits any "fraudulent business act or practice."

87.     Defendants' misleading statements, non-disclosures and omissions of material fact as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

88.     There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.  Specifically, Defendants could have sold UnitedHealth Medicare Supplement coverage without charging consumers for illegal commissions.

89.     Defendants' conduct caused and continues to cause substantial injury to Plaintiffs and the other Class members.  Plaintiffs have suffered injury in fact and have lost money as a result of Defendants' unfair conduct; to-wit: Plaintiffs and the Class were injured by the actual loss of the 4.95% commission payment and paid more for UnitedHealth Medicare Supplement insurance because of Defendants' challenged conduct.

90.     Accordingly, Plaintiffs seek restitution and injunctive relief individually and on behalf of the putative Classes.

**COUNT II**
**(Unjust Enrichment)**

91.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated herein.

92.     Plaintiffs and the Class conferred a benefit on Defendants in the form of illegal commissions.  These commissions amounted to 4.95% of Plaintiff's Member Contributions. Plaintiffs and the Class have conferred this benefit every month that they have paid Member Contributions for their UnitedHealth Medicare Supplement coverage.

93.     Defendants voluntarily accepted and retained this benefit.

94.     Defendant, through misleading statements, non-disclosures and omissions of material fact as more fully set forth above, engaged in fraudulent actions to induce Plaintiffs and Class members to purchase AARP Medigap policies.

95.     Because this benefit was an illegal commission, and the true nature of this benefit was hidden from consumers through material misrepresentations and omissions, it would be unjust and inequitable for the Defendants to retain it without paying the value thereof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

A.   That Defendants be cited according to law to appear and answer herein; and upon final hearing a permanent injunction be issued, restraining and enjoining Defendants, Defendants' successors, assigns, officers, agents, servants, employees and attorneys and any other person in active concert or participation with Defendants, from engaging in the acts or practices complained of herein;

B.   For an Order requiring Defendants to restore all money or other property taken from identifiable persons by means of unlawful acts or practices and award judgment for damages and restitution in an amount within the jurisdictional limits of this Court to compensate for such losses;

C.   For an Order requiring the disgorgement of all sums taken from consumers by means of deceptive practices, together with all proceeds, interest, income, profits and accessions thereto;

D.   An award of compensatory, statutory, and punitive damages, in an amount to be determined;

E.   That the Court certify this action and the Class as requested herein, appointing Plaintiffs as Class Representatives, and appointing Bursor & Fisher, P.A. as Class Counsel;

F.   Award Plaintiffs and the Class members court costs and reasonable and necessary attorneys' fees in relation to the amount of work expended, and any other relief the Court determines is proper;

G.   Interest on all amounts awarded, as allowed by law; and

H.   Provide such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  September 21, 2020

Respectfully Submitted,

**BURSOR & FISHER, P.A.**

By:＿＿＿*/s/ L. Timothy Fisher*＿＿＿＿＿＿

L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
E-Mail:  scott@bursor.com

*Attorneys for Plaintiffs*